## WILLIAM A. PEVERLY vs. CITY OF BOSTON.

Suffolk.   Nov. 16, 1883. — Jan. 22, 1884.   C. ALLEN & HOLMES, JJ., absent

A passenger on a ferry-boat, upon the boat approaching the wharf, left the cabin, and, with others, stood in the passageway leading from the cabin to a gate near the end of the boat. He was in the front rank of those thus standing, and was over two feet distant from the gate. The lock at the top of the gate had been removed, and the catch on the bottom was out of working order. The gate was lifted, apparently by some unauthorized person, no servant of the corporation owning the boat being there to operate the gate, and, by a sudden movement of the crowd, the passenger was pressed against the gate, and injured. *Held*, in an action by him against the corporation, that the question whether he was in the exercise of due care was for the jury.

In an action against a corporation owning a ferry-boat, for personal injuries occasioned to a passenger, who, while standing, with others, in the passageway leading from the cabin to a gate near the end of the boat, while it was approaching the wharf, was, by a sudden movement of the crowd, pressed against the gate while it was being lifted, it is no defence that it was lifted by an unauthorized person, if passengers were exposed to danger by the lifting of the gate, and the gate was not fastened, and there was no servant of the corporation there to attend to it.

In an action against a corporation owning a ferry-boat, for personal injuries occasioned to a passenger, who, while standing, with others, in the passageway leading from the cabin to a gate near the end of the boat, while it was approaching the wharf, was, by a sudden movement of the crowd, pressed against the gate, which was lifted by an unauthorized person, no servant of the corporation being there to attend to the gate, evidence is inadmissible in defence, that the boat never had approached the wharf before without a deck-hand at the bow of the boat; and that no accident ever had happened before by the raising of the gate or by the pressing of passengers against it.

A passenger, who, on the approach of a steam ferry-boat to the wharf, leaves the cabin and stands on the deck between the cabin and the end of the boat, cannot be said, as matter of law, not to be in the exercise of due care.

TORT for personal injuries sustained by the plaintiff while a passenger on a ferry-boat used by the defendant as a common carrier of passengers for hire. Trial in the Superior Court, before *Knowlton*, J., who allowed a bill of exceptions, in substance as follows :

The jury took a view of the boat, and of the gates at the ends thereof, hereinafter described. The boat, except as herein specified, was of the ordinary form of ferry-boats, the centre lengthwise being occupied and traversed by vehicles, and either side by foot-passengers. Amidships of the boat, on either side, are cabins. From the cabin to the gate at which the accident

happened is a strip of deck which is commonly occupied by foot-passengers during the trip, and is passed over by them in entering and leaving the boat. This strip was spoken of as a passageway, during the trial, by the counsel on both sides, and by two of the defendant's witnesses. A canopy extends from the cabin over eleven feet of this strip, and the remaining sixteen feet thereof is not in any way sheltered or roofed in. There is no gate or partition between the space under the canopy and the rest of the deck. In the cabin and under the canopy are seats, but not elsewhere. At each end of the boat, on either side of the driveway for vehicles, and between it and the space occupied and traversed by foot-passengers, are posts, and attached to and working upon each of said posts is a pair of gates, each pair operated together and folded perpendicularly, one of said gates when lowered extending across the end of the strip of deck occupied and traversed by foot-passengers as aforesaid, and the other extending across one half the driveway, and the two pairs extending across the whole end of the boat. Each gate is composed of two horizontal iron rods, an upper and a lower, and of several vertical iron rods bolted on to the horizontal ones. The latter are hinged to the post, in such a way that, when the gates are to be opened, the horizontal rods swing upward upon the end next the post as pivots, gradually assuming a vertical position till all the parts composing the gate are in a vertical position, close to each other and to the post. Upon each post is plainly painted, " Hands off the Gates." At the time of the accident there was a chain attached to a post twenty-five and one half inches back from the gate, to be hooked across the passageway, at an angle, to a staple at the outside of the boat, so that the shortest distance between the chain and the outer end of the gate was twelve inches. The chain as it hung when hooked into the staple was slack, and a person pressing against it in the middle could bring it within eight inches of the gate when the gate was lowered. This chain was formerly used there, and was not put up at the time of the construction of the gate.

At the time of the accident, there was no lock or fastening of any kind upon the gate. When the gates were put on the boat, there were locks at the top which operated with a key that

fastened the two pair of gates together. At the bottom of each gate, on the end at the centre of the boat, was a bolt, with a handle, flange, and catch, that went down into a socket on the deck, and turned round and locked the gate; and to open the gate it was necessary to take hold of the handle and turn the bolt a quarter round. At the time of the accident, the lock at the top had been removed, how long before was not shown, and the catch on the bolt which went down into the socket in the deck was off, so that this did not work and lock the gate. When this catch was broken off, or allowed to get out of working order, was not shown. The captain of the boat testified, on cross-examination : " I don't know when the lock at the top was taken off. I don't know whether the catch has been broken off, or whether it is there yet. I don't know how long that boat has been running without it being on at all. I did not order it off. I don't know that it is off. I have not been down to examine it. The purpose of putting the lock on the gates was to keep passengers from opening the gates, and to prevent the passengers from being crushed to death between the boat and the drop." Since the accident, a chain has been put on, which is attached to the post in the rear of the gate and permanently bolted to the outside end of the gate, and operates with it. As to the locks that operated with a key and locked the gates together, the captain testified : " They would never stay there. The passengers could shake them, and they would open. We tried them every way, and gave them up. We did not try any other method of locking, — either a padlock, or chain with a lock, or anything of that kind, to fasten the gates together. The bolt that went down into the deck and turned part way round, when in working order, held the gate fast, so that no passenger could throw it up."

The crew ordinarily consisted of a captain, engineer, fireman, and two deck-hands ; and the ordinary process of opening the gates was as follows : one deck-hand stood near the gates at the bow, and the other near those at the stern, till about the end of the trip, when the man at the stern, at a signal from the captain, dropped a pin into the rudder to make it serve as a prow for the return trip, and then came forward ; the man at the bow, standing in the driveway, raised one pair of gates, while

both men stepped outside to the extreme front of the boat, closing the gates behind· them; on the boat coming close to the drop, the two deck-hands stepped ashore, one on each side, hooked the chains to the boat, worked the windlass till the boat was fast, and then went to the middle of the driveway; each took hold of one gate and faced the outside of the boat so as to be able to see the whole of the gate that he had hold of, and kept his eye on the gate to see that no one got hurt; then they raised the gates.

The plaintiff, being the sole witness in his behalf as to the accident, and being uncontradicted, testified as follows: "I started to come to Boston in the morning. When I got to the East Boston ferry it was very foggy; and, when I went aboard the boat, I went through the cabin, or into the cabin, and stayed there some time, I don't know exactly how long. It was very thick, and the boat was running very irregularly. It struck Battery Wharf; and then I went through the cabin, and went forward within two or three feet of the gate, the same as lots of the passengers. We were just as thick as we could stand; and when the boat went into the slip, I saw somebody hook on the boat. They hooked on the boat, and jumped at the middle where the horses went out, where they were heaving this gate up, and this gate went up, and the instant the gate started, there seemed to be a big pressure of the passengers, — they kind of rushed quick, — and in half a second I was thrown forward against this gate, I being nearer the post than any one, and I threw my hand up this way, to save myself from going against the gate, and I was triced right up by my little finger on that hand, and as quick as I got caught I cried out. I grabbed hold of this hand, and gave my finger a jerk. At the same time a couple of passengers jumped at the gate and took hold of it to pull it down to release my hand; I can't tell whether they did or not. I pulled my hand out, and started up the drop. I should judge there were from a hundred and fifty to two hundred more passengers than the boat generally carries, on account of its being foggy." He further testified that, when he went out from the cabin, the chain attached to the post two feet back from the gate was lying on the deck in front of him, as it was very common to be lying on the deck.

On cross-examination, he testified: "For three or four years I have come over this ferry every week, from one to three or four times a week; the gates were put on after I began to come this way from Chelsea, and something like three or four years ago. I have seen the gates work, and knew how they worked exactly, and knew the danger of it; have seen the sign on the gates, 'Hands off the Gate.'" When asked, on redirect examination, what he meant by knowing the danger of the gate, he said: "I mean if a man got against them, or put his hand on them when in operation, of course it would injure him. I did not put my hand voluntarily on the gate." He further testified, on cross-examination, that he spent most of the time in the cabin, where there was room enough to stay; that when the boat touched Battery Wharf, he came forward with a great many others; that there was no one directly between him and the gate, but there were passengers on his right, nearer the gate, and at its end where it goes up; that he stood over two feet from the gate, and stood back of the chain; that he was the person nearest to the gate at that point; that the passengers were crowding up there, and that was the reason he got shoved when they made a lurch. In answer to many and varied questions as to his purpose of being there, etc., he testified: "I went forward the same as I have been hundreds of times, and not only me, but hundreds of others;" that he went forward so as to come out with the other people, he supposed; that at the same time he was not in a hurry; that he went forward so as to crowd along and get along and see where the boat was, as much as anything; that the passengers hurried up the drop as quick as they could to get into the horse-car; that persons who get off first are more apt to get seats; that he wanted to get a seat in the horse-car; that he should say he went down in front so as to be off among the first, but he was not in a hurry; that he went there so as to get out when the gate opened, the same as the rest of the passengers, and to come to Boston; that there were a great many people standing out there when he got out; that the boat was unusually crowded, but not so crowded but what one could get along: that there was plenty of room where he stood; that a good many jumped off the boat on to Battery Wharf, which took off some of the crowd; that he did not see them jump off, but he

heard others say so; that he went by a good many people to get where he stood; that he was with quite a number of others trying to get as near the gate as he could without getting injured; that he probably wanted to get off among the first, because passengers will often come forward, if they can, to get nearer the gates, and not near enough to injure them, so as to get out first; and that he was there to get out as quick as he could, but he was not in a hurry.

He further testified, that he saw two deck-hands when he went aboard; that when he came out of the cabin he did not see the deck-hands or any men at work on the boat; that he saw a man at work at the windlass by which the boat is hooked and pulled up to the drop, who hooked on the boat and jumped to throw open the gates; that he saw this man jump towards the gate when they opened it, but he did not see him take hold of the gate; that he did not see who it was that took hold of the gate; that he did not see anybody touch the chain that he found in front of him; that he did not start from his place before the gate went up; that when the passengers started he was shoved up against the gate; that he did not try to get out; that the passengers on his right had to go out first; that before he could get out there were twenty out; that he did not touch the gate, with any part of his person, before he was pressed against it; that he was two or three feet back from it; that there was no signal or notice or warning before the gate was thrown up that morning.

The defendant's witnesses, being the captain, who had been employed on the ferries nine years, and two deck-hands, who had been there employed about six years each, testified, without contradiction, that, when the boat reached the Boston side, she was opposite Battery Wharf, the next wharf to the ferry slip; that there were vessels at anchor in the stream, invisible owing to the fog, which rendered it dangerous to back off into the stream; that one deck-hand, at the captain's order, went ashore on Battery Wharf and attached a hawser to a pile; that when the captain was ready to have the hawser thrown off the wharf, the boat had drifted out so far that the deck-hand could not get aboard; that the captain knew when he sent him ashore that he intended to leave him; that this deck-hand ran as fast as he

could on shore around to the drop towards the boat, and arrived at the end of the drop about as the boat did; that he at once hooked the boat on, and began to wind up the windlass; that when he arrived there, the gates were up, and the passengers were coming off; that he did not touch the gates or chains; that the other deck-hand was on the upper deck, at work on the hawser; that as soon as he pulled it in, the captain sent him down to the lower deck to drop the pin into the rudder; that this pin is dropped to secure the rudder for the next passage across; that this second deck-hand then went to the front of the boat, and the gates were up, and the most of the passengers were off, — only twenty-five or thirty left; that he did not touch the gates or the chain; that he heard no outcry, only the crowd, kind of excited, yelling, and anxious to get off; that the captain did not see the gates go up, or who raised them; that the chains across the passageway were hooked up at the beginning of the trip, as they always were. On cross-examination, the captain testified that the dropping of the pin in the rudder, which he sent the deck-hand to do, was not necessary to enable him to make a landing, but to secure the rudder for the return trip; that when he sent the man to the stern to drop the pin, he knew that there was no deck-hand on the bow of his boat; that he did not wait before entering the slip a sufficient time for the man who had gone round to get there; that he went into the slip knowing that there was nobody there to receive his boat, and knowing that he had sent the other man back to drop the pin, which was not necessary for making a landing.

One of the deck-hands testified that the boat, at the time of this accident, came into the slip and up to the drop without anybody at the bow to take charge of the gates; that, after he had put the hawser over the pile, he could have got back on board the boat; that he could have left the hawser attached to the pile, and, after the boat had been warped round, the hawser could have been cast off from the boat, and subsequently recovered from the wharf; that he was left upon the wharf merely to cast off the hawser from the pile.

The defendant asked the captain, " Besides the time of this accident, how many times did you ever come up to the drop without a deck-hand at the bow of your boat? " and the answer

was, "Never." The same question was subsequently asked the deck-hands, and excluded.

The defendant asked the captain and one of the deck-hands, whether, besides this accident, they ever knew a person to get hurt by being pushed against the gate by the crowd at the same time that the passengers pushed the gate up, and offered to prove, as bearing on the question of the defendant's negligence, that no accident of this sort had ever before occurred. The plaintiff objected, and the judge excluded the testimony.

The plaintiff contended, upon the evidence, and argued to the jury, among other things, that in omitting to have locks upon the gates, and in allowing the bolt and catch which fastened the gates to be out of repair, and in omitting to have persons to operate the gates, and in omitting to guard them more effectually, the defendant was guilty of negligence.

At the close of the evidence, the defendant requested the judge to rule that the plaintiff had introduced no evidence to show the exercise of due care on his part; but the judge declined so to rule.

The judge instructed the jury, in part, as follows, to which no exception was taken: "The burden of proof is also upon the plaintiff to establish another proposition, — that this accident happened without any contributory carelessness or negligence on his part. If you find upon the evidence that the defendant was guilty of neglect of legal duty, and that the plaintiff has established that by a fair preponderance of the evidence, you will come to the second proposition, and see whether he has made that out; namely, that he himself was in the exercise of due care at this time, and that no fault of his contributed to the accident. The rule of law is, in general, that the plaintiff must exercise such care as persons of ordinary intelligence and ordinary care would exercise, under like circumstances, with reference to this danger. If he knew of a danger, and voluntarily put himself in the way of it, he cannot recover for any result of his voluntary action in that particular. If a person, knowing the risks, sees fit to take those risks voluntarily, he cannot afterwards ask another to make compensation for what comes from such action. You will judge whether he, in this particular, was in the exercise of such care as ordinary men would exercise

under such circumstances; and you will consider further whether he voluntarily assumed certain dangers, and, if so, whether what happened to him resulted from such assumption of these dangers, or whether it resulted from some other danger, of which he had no knowledge, and which he did not assume; and upon all the evidence, weighing it carefully, you will come to such conclusion as you feel constrained to, for the plaintiff or against him, upon this proposition.

" I am asked by the defendant to instruct you that a desire to get off the boat quickly is not a sufficient excuse for the plaintiff's going near the gates, if there were special risks incurred by so doing. I give it with a modification, and I give it in this form as modified: A desire to get off the boat quickly is not a sufficient excuse for the plaintiff's going near the gates, if there were such special risks incurred by so doing that it was not reasonably safe and prudent for him to go there."

The defendant requested the judge to instruct the jury, that, if the plaintiff went from the cabin to his position near the gate voluntarily, and with no occasion therefor nor inducement thereto, caused by the managers of the boat, except their permission, and if there were special risks attached to that position, the verdict must be for the defendant. The judge refused to give this instruction.

The jury returned a verdict for the plaintiff, in the sum of $2300; and the defendant alleged exceptions.

*E. B. Hagar*, for the defendant.

*F. S. Hesseltine*, (*W. H. Hart* with him,) for the plaintiff.

DEVENS, J. That there was evidence tending to show negligence in the arrangement or management of the gates on the boat from which the injury to the plaintiff was occasioned, is not controverted by the defendant. It contends that the plaintiff has failed to show that he was himself in the exercise of due care; that a case of contributory negligence is thus presented, which should prevent his recovery; and that the judge who presided at the trial was not justified in submitting the question to the jury. It is not necessary for the plaintiff to prove due care on his part by directly affirmative evidence; the inference of such care may be drawn from the absence of all appearance of fault, either positive or negative, on his part, in the circumstances

under which the injury was received. *Mayo* v. *Boston & Maine Railroad,* 104 Mass. 137.

The gates were originally provided with locks at the top, which fastened them together, and were further provided at the bottom with a bolt, handle, flange, and catch, by which they were there firmly secured. At the time of the accident, the locks at the top had been removed, and the catch on the bottom was not in working order, so that neither would operate to fasten the gates. How long they had been in this condition did not appear, nor did it appear that the plaintiff was aware of this deficiency in their fastening. He had seen the gates work, knew how they worked, and that there was danger if a man got against them, or put his hand upon them when they were being raised.

That which appears as to the plaintiff's conduct, as testified to by himself, does not show a want of due care such as should bar his recovery, and it might fairly have been inferred from his description that he was in the exercise of it. That the plaintiff was desirous to be among the first to leave the boat, either to take the horse-cars or for any other purpose, would of course afford no excuse for negligently placing himself in any position of danger. He came out of the cabin, where there was room enough to stay, and passed into the front rank of those who had assembled in the passage leading from the cabin to the gates, so that there was no one between himself and them. He was desirous of getting as near the gates as he could without being injured. The guard-chain, which was attached to a post twenty-five and one half inches from the gates, and intended to be hooked at an angle to a staple on the outside of the boat, by some accident was down, but the plaintiff stood back of it, and over two feet from the gates. The injury occurred by the lifting of the gates, apparently by some unauthorized person, no servant of the defendant being there to operate them, and the sudden movement of the crowd, which pressed the plaintiff against them while they were thus being lifted. That the place occupied by the plaintiff was not intended for passengers, and that they were to keep themselves confined in the cabins until the arrival of the boat, could not have been ruled. That the spaces between the cabins and the end of such boats,

although unprovided with seats and only partially covered by a roof, are often occupied by passengers, without objection, during the transit of the boat, and as it approaches the shore, is a matter of common knowledge. It cannot be held, as matter of law, that they are to be deemed so unsafe that one standing there is guilty of a want of due care.

It was indeed held in *Hickey* v. *Boston & Lowell Railroad*, 14 Allen, 429, on which the defendant relies, that a traveller by railroad cannot maintain an action against a railroad company, to recover damages for a personal injury sustained by him, in consequence of his voluntarily and unnecessarily standing upon the platform of a passenger car while the train is in motion. That case is limited in its application to modes of transportation such as were there considered, and to positions clearly not intended for passengers, such as the plaintiff there occupied. *Maguire* v. *Middlesex Railroad*, 115 Mass. 239.

Whether the situation, arrangement, and permitted use of the passageway, as it has been termed, were such as to authorize the plaintiff to stand therein, in expectation of the immediate arrival of the boat, and whether, when there, he conducted himself with ordinary care and prudence, were questions to be decided by the jury. *Wheelock* v. *Boston & Albany Railroad*, 105 Mass. 203. *Barden* v. *Boston, Clinton & Fitchburg Railroad*, 121 Mass. 426. *Worthen* v. *Grand Trunk Railway*, 125 Mass. 99. If he might properly stand in the passageway at all, the fact that he was in the front rank of the passengers was to be considered in connection with the distance at which they all stood from the gates. It would be impossible to say that, because he was in this position, he was therefore legally guilty of negligence.

The defendant further contends that, as this accident resulted, except so far as the plaintiff's own negligence may have contributed thereto, from the acts of unauthorized persons, who threw open the gates, while others pushed the plaintiff against them, the case falls within *Joy* v. *Winnisimmet Company*, 114 Mass. 63, and the plaintiff cannot recover. That case rests upon the ground that there was no duty to have the chain so fastened as to prevent passengers from letting it down, and they having done so, by reason of which the plaintiff was induced to leave the boat before the drop was prepared to receive him,

the defendant was held not to be liable. But if passengers were liable to be injured by the raising of the gates, there was a duty on the part of the defendant that they should be so locked or guarded by its servants that this should not be done.

The evidence that the boat had never approached the wharf before without a deck-hand at the bow of the boat was properly excluded, as was the evidence that no accident had ever happened before by the raising of the gates, or by the pushing of passengers against them. *Lewis* v. *Smith*, 107 Mass. 334. *Lane* v. *Boston & Albany Railroad*, 112 Mass. 455. *Maguire* v. *Middlesex Railroad, ubi supra.*

The instructions as given were in conformity with well-settled principles, and the defendant has no just ground of exception to the refusal to rule as requested.         *Exceptions overruled.*